# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued October 11, 2019 Decided February 14, 2020

No. 19-5094

CHARLES GRESHAM, ET AL.,
APPELLEES

v.

ALEX MICHAEL AZAR, II, SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES IN HIS OFFICIAL CAPACITY, ET AL.,
APPELLANTS

STATE OF ARKANSAS,
APPELLEE

---

Consolidated with 19-5096

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-01900)

---

*Alisa B. Klein*, Attorney, U.S. Department of Justice, argued the cause for federal appellants. With her on the briefs

were *Mark B. Stern*, Attorney, *Robert P. Charrow*, General Counsel, U.S. Department of Health and Human Services, and *Brenna E. Jenny*, Deputy General Counsel.

*Leslie Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Nicholas J. Bronni*, Solicitor General, *Vincent M. Wagner*, Deputy Solicitor General, and *Dylan L. Jacobs*, Assistant Solicitor General, were on the brief for appellant State of Arkansas.

*Ian Heath Gershengorn* argued the cause for plaintiff-appellees. With him on the brief were *Jane Perkins*, *Thomas J. Perrelli*, *Devi M. Rao*, *Natacha Y. Lam*, *Zachary S. Blau*, and *Samuel Brooke*.

*Kyle Druding* was on the brief for *amici curiae* American College of Physicians, et al. in support of plaintiffs-appellees.

*Edward T. Waters*, *Phillip A. Escoriaza*, and *Christopher J. Frisina* were on the brief for *amici curiae* Deans, Chairs, and Scholars in support of plaintiffs-appellees.

*Judith R. Nemsick*, *Jon M. Greenbaum*, and *Sunu Chandy* were on the brief for *amici curiae* Lawyers Committee for Civil Rights Under Law, et al. in support of appellees and affirmance.

Before: PILLARD, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Residents of Kentucky and Arkansas brought this action against the Secretary of

Health and Human Services. They contend that the Secretary acted in an arbitrary and capricious manner when he approved Medicaid demonstration requests for Kentucky and Arkansas. The District Court for the District of Columbia held that the Secretary did act in an arbitrary and capricious manner because he failed to analyze whether the demonstrations would promote the primary objective of Medicaid—to furnish medical assistance. After oral argument, Kentucky terminated the challenged demonstration project and moved for voluntary dismissal. We granted the unopposed motion. The only question remaining before us is whether the Secretary's authorization of Arkansas's demonstration is lawful. Because the Secretary's approval of the plan was arbitrary and capricious, we affirm the judgment of the district court.

## I. Background

Originally, Medicaid provided health care coverage for four categories of people: the disabled, the blind, the elderly, and needy families with dependent children. 42 U.S.C. § 1396-1. Congress amended the statute in 2010 to expand medical coverage to low-income adults who did not previously qualify. *Id.* at § 1396a(a)(10)(A)(i)(VIII); *NFIB v. Sebelius*, 567 U.S. 519, 583 (2012). States have a choice whether to expand Medicaid to cover this new population of individuals. *NFIB*, 567 U.S. at 587. Arkansas expanded Medicaid coverage to the new population effective January 1, 2014, through their participation in private health plans, known as qualified health plans, with the state paying premiums on behalf of enrollees. Appellees' Br. 14; *Gresham v. Azar*, 363 F. Supp. 3d 165, 171 (D.D.C. 2019).

Medicaid establishes certain minimum coverage requirements that states must include in their plans. 42 U.S.C. § 1396a. States can deviate from those requirements if the

Secretary waives them so that the state can engage in "experimental, pilot, or demonstration project[s]." 42 U.S.C. § 1315(a). The section authorizes the Secretary to approve "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid. *Id.*

Arkansas applied to amend its existing waiver under § 1315 on June 30, 2017. Arkansas Administrative Record 2057 ("Ark. AR"). Arkansas gained approval for its initial Medicaid demonstration waiver in September 2013. In 2016, the state introduced its first version of the Arkansas Works program, encouraging enrollees to seek employment by offering voluntary referrals to the Arkansas Department of Workforce Services. Dissatisfied with the level of participation in that program, Arkansas's new version of Arkansas Works introduced several new requirements and limitations. The one that received the most attention required beneficiaries aged 19 to 49 to "work or engage in specified educational, job training, or job search activities for at least 80 hours per month" and to document such activities. *Id.* at 2063. Certain categories of beneficiaries were exempted from completing the hours, including beneficiaries who show they are medically frail or pregnant, caring for a dependent child under age six, participating in a substance treatment program, or are full-time students. *Id.* at 2080–81. Nonexempt "beneficiaries who fail to meet the work requirements for any three months during a plan year will be disenrolled . . . and will not be permitted to re-enroll until the following plan year." *Id.* at 2063.

Arkansas Works included some other new requirements in addition to the much-discussed work requirements. Typically, when someone enrolls in Medicaid, the "medical assistance under the plan . . . will be made available to him for care and

services included under the plan and furnished in or after the third month before the month in which he made application." 42 U.S.C. § 1396a(a)(34). Arkansas Works proposed to eliminate retroactive coverage entirely. Ark. AR 2057, 2061. It also proposed to lower the income eligibility threshold from 133% to 100% of the federal poverty line, meaning that beneficiaries with incomes from 101% to 133% of the federal poverty line would lose health coverage. *Id.* at 2057, 2060–61, 2063. Finally, Arkansas Works eliminated a program in which it used Medicaid funds to assist beneficiaries in paying the premiums for employer-provided health care coverage. *Id.* at 2057, 2063, 2073. Arkansas instead used Medicaid premium assistance funds only to help beneficiaries purchase a qualified health plan available on the state Health Insurance Marketplace, requiring all previous recipients of employer-sponsored coverage premiums to transition to coverage offered through the state's Marketplace. *Id.* at 2057, 2063, 2073.

On March 5, 2018, the Secretary approved most of the new Arkansas Works program via a waiver effective until December 31, 2021, but with a few changes. He approved the work requirements but under the label of "community engagement." *Id.* at 2. The Secretary authorized Arkansas to limit retroactive coverage to thirty days before enrollment rather than a complete elimination of retroactive coverage. *Id.* at 3, 12. He also approved Arkansas's decision to terminate the employer-sponsored coverage premium assistance program. *Id.* at 3. The Secretary did not, however, permit Arkansas to limit eligibility to persons making less than or equal to 100% of the federal poverty line. *Id.* at 3 n.1, 11. Instead, the Secretary kept the income eligibility threshold at 133% of the federal poverty line. *Id.* at 3 n.1, 11.

In the approval letter, the Secretary analyzed whether Arkansas Works would "assist in promoting the objectives of

Medicaid." *Id.* at 3. The Secretary identified three objectives that he asserted Arkansas Works would promote: "improving health outcomes; . . . address[ing] behavioral and social factors that influence health outcomes; and . . . incentiviz[ing] beneficiaries to engage in their own health care and achieve better health outcomes." *Id.* at 4. In particular, the Secretary stated that Arkansas Works's community engagement requirements would "encourage beneficiaries to obtain and maintain employment or undertake other community engagement activities that research has shown to be correlated with improved health and wellness." *Id.* Further, the Secretary thought the shorter timeframe for retroactive eligibility would "encourage beneficiaries to obtain and maintain health coverage, even when they are healthy," which, in turn, promotes "the ultimate objective of improving beneficiary health." *Id.* at 5. The letter also summarized concerns raised by commenters that the community engagement requirement would "caus[e] disruptions in care" or "create barriers to coverage" for beneficiaries who are not exempt. *Id.* at 6–7. In response, the Secretary noted that Arkansas had several exemptions and would "implement an outreach strategy to inform beneficiaries about how to report compliance." *Id.*

The new work requirements took effect for those aged 30 to 49 on June 1, 2018, and for those aged 20 to 29 on January 1, 2019. *Gresham*, 363 F. Supp. 3d at 172. Charles Gresham along with nine other Arkansans filed an action for declaratory and injunctive relief against the Secretary on August 14, 2018. The district court on March 27, 2019, entered judgment vacating the Secretary's approval, effectively halting the program. *Gresham*, 363 F. Supp. 3d at 176–85. In its opinion supporting the judgment, the district court relied on *Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018) (*Stewart I*), which is the district court's first opinion considering Kentucky's similar demonstration, *Gresham*, 363 F. Supp. 3d at 176. In *Stewart I*,

the district court turned to the provision authorizing the appropriations of funds for Medicaid, 42 U.S.C. § 1396-1, and held that, based on the text of that appropriations provision, the objective of Medicaid was to "furnish . . . medical assistance" to people who cannot afford it. *Stewart I*, 313 F. Supp. 3d at 260–61.

With its previously articulated objective of Medicaid in mind, the district court then turned to the Secretary's approval of Arkansas Works. First, the district court noted that the Secretary identified three objectives that Arkansas Works would promote: "(1) 'whether the demonstration as amended was likely to assist in improving health outcomes'; (2) 'whether it would address behavioral and social factors that influence health outcomes'; and (3) 'whether it would incentivize beneficiaries to engage in their own health care and achieve better health outcomes.'" *Gresham*, 363 F. Supp. 3d at 176 (quoting Ark. AR 4). But "[t]he Secretary's approval letter did not consider whether [Arkansas Works] would reduce Medicaid coverage. Despite acknowledging at several points that commenters had predicted coverage loss, the agency did not engage with that possibility." *Id.* at 177. The district court also explained that the Secretary failed to consider whether Arkansas Works would promote coverage. *Id.* at 179. Instead, the Secretary considered his alternative objectives, primarily healthy outcomes, but the district court observed that "'focus on health is no substitute for considering Medicaid's central concern: covering health costs' through the provision of free or low-cost health coverage." *Id.* (quoting *Stewart I*, 313 F. Supp. 3d at 266). "In sum," the district court held:

> the Secretary's approval of the Arkansas Works Amendments is arbitrary and capricious because it did not address—despite receiving substantial comments on the matter—whether and how the

> project would implicate the "core" objective of Medicaid: the provision of medical coverage to the needy.

*Id.* at 181. The district court entered final judgment on April 4, 2019, and the Secretary filed a notice of appeal on April 10, 2019.

This case was originally a consolidated appeal from the district court's judgment in both the Arkansas and Kentucky cases. The district court twice vacated the Secretary's approval of Kentucky's demonstration for the same failure to address whether Kentucky's program would promote the key objective of Medicaid. *Stewart v. Azar*, 366 F. Supp. 3d 125, 156 (D.D.C. 2019) (*Stewart II*); *Stewart I*, 313 F. Supp. 3d at 274. On December 16, 2019, Kentucky moved to dismiss its appeal as moot because it "terminated the section [1315] demonstration project." Intervenor-Def.-Appellant's Mot. to Voluntarily Dismiss Appeal 1–2 (Dec. 16, 2019), ECF No. 1820334. Neither the government nor the appellees opposed the motion. Gov't's Resp. (Dec. 18, 2019), ECF No. 1820655; Appellees' Resp. (Dec. 20, 2019), ECF No. 1821219.

Although the Secretary has considerable discretion to grant a waiver, we reject the government's contention that such discretion renders his waiver decisions unreviewable. The Administrative Procedure Act's (APA) exception from judicial review for an action committed to agency discretion is "very narrow," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019), barring judicial review only in those "rare instances" where "there is no law to apply," *Overton Park*, 401 U.S. at 410 (internal quotation marks and citation omitted). The Medicaid statute provides the legal standard we apply here: The Secretary may only approve

"experimental, pilot, or demonstration project[s]," and only insofar as they are "likely to assist in promoting the objectives" of Medicaid, 42 U.S.C. § 1315(a). Section 1315 approvals are not among the rare "categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Dep't of Commerce*, 139 S. Ct. at 2568.

Additionally, the government asked that we address "the reasoning of the district court's opinion in *Stewart* and the underlying November 2018 HHS approval of the Kentucky demonstration," and second that we vacate the district court's judgment against the federal defendants in the Kentucky case *Stewart II*, 66 F. Supp. 3d 125. Gov't's Resp. 1–2. The appellees opposed both of those additional requests. Appellees' Resp. 1–4. We granted the motion to voluntarily dismiss but declined to vacate the district court's judgment against the federal defendants in *Stewart II*. As to the government's first request, we do not rely on the Secretary's reasoning in the November 2018 approval of Kentucky's demonstration when considering the Secretary's approval of Arkansas's demonstration.

"We review *de novo* the District Court's grant of summary judgment, which means that we review the agency's decision on our own." *Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004). Therefore, we will review the Secretary's approval of Arkansas Works in accordance with the Administrative Procedure Act and will set it aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also C.K. v. New Jersey Dep't of Health & Human Servs.*, 92 F.3d 171, 181–82 (3d Cir. 1996) (applying the arbitrary and capricious standard of review to a waiver under § 1315); *Beno v. Shalala*, 30 F.3d 1057, 1066–67 (9th Cir. 1994) (same); *Aguayo v. Richardson*, 473 F.2d 1090, 1103–08 (2d Cir. 1973) (same).

An agency action that "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II. DISCUSSION

### A. Objective of Medicaid

The district court is indisputably correct that the principal objective of Medicaid is providing health care coverage. The Secretary's discretion in approving or denying demonstrations is guided by the statutory directive that the demonstration must be "likely to assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315. While the Medicaid statute does not have a standalone purpose section like some social welfare statutes, *see, e.g.*, 42 U.S.C. § 601(a) (articulating the purposes of the Temporary Assistance for Needy Families program); 42 U.S.C. § 629 (announcing the "objectives" of the Promoting Safe and Stable Families program), it does have a provision that articulates the reasons underlying the appropriations of funds, 42 U.S.C. § 1396-1. The provision describes the purpose of Medicaid as

> to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care.

*Id.* In addition to the appropriations provision, the statute defines "medical assistance" as "payment of part or all of the cost of the following care and services or the care and services themselves." 42 U.S.C. § 1396d(a). Further, as the district court explained, the Affordable Care Act's expansion of health care coverage to a larger group of Americans is consistent with Medicaid's general purpose of furnishing health care coverage. *See Stewart I*, 313 F. Supp. 3d at 260 (citing Pub. L. No. 111-148, 124 Stat. 119, 130, 271 (2010)). The text consistently focuses on providing access to health care coverage.

Both the First and Sixth Circuits relied on Medicaid's appropriations provision quoted above in concluding that "[t]he primary purpose of Medicaid is to enable states to provide medical services to those whose 'income and resources are insufficient to meet the costs of necessary medical services.'" *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001) (quoting 42 U.S.C. § 1396 (2000)), *aff'd*, 538 U.S. 644 (2003); *Price v. Medicaid Dir.*, 838 F.3d 739, 742 (6th Cir. 2016). Similarly, the Ninth Circuit relied on both the appropriations provision and the definition of "medical assistance" when describing Medicaid as "a federal grant program that encourages states to provide certain medical services" and identifying a key element of "medical assistance" as the spending of federally provided funds for medical coverage. *Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029, 1031, 1034–35 (9th Cir. 2011).

Beyond relying on the text of the statute, other courts have consistently described Medicaid's objective as primarily providing health care coverage. For example, the Third Circuit succinctly stated, "We recognize, of course, that the primary purpose of medicaid is to achieve the praiseworthy

social objective of granting health care coverage to those who cannot afford it." *W. Va. Univ. Hosps., Inc. v. Casey*, 885 F.2d 11, 20 (3d Cir. 1989), *aff'd*, 499 U.S. 83 (1991). Likewise, the Supreme Court characterized Medicaid as a "program . . . [that] provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs." *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006); *see also Virginia ex rel. Hunter Labs., L.L.C. v. Virginia*, 828 F.3d 281, 283 (4th Cir. 2016) (quoting *Ahlborn* in the section of the decision explaining the important aspects of Medicaid).

The statute and the case law demonstrate that the primary objective of Medicaid is to provide access to medical care. There might be secondary benefits that the government was hoping to incentivize, such as healthier outcomes for beneficiaries or more engagement in their health care, but the "means [Congress] has deemed appropriate" is providing health care coverage. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994). In sum, "the intent of Congress is clear" that Medicaid's objective is to provide health care coverage, and, as a result, the Secretary "must give effect to [that] unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

Instead of analyzing whether the demonstration would promote the objective of providing coverage, the Secretary identified three alternative objectives: "whether the demonstration as amended was likely to assist in improving health outcomes; whether it would address behavioral and social factors that influence health outcomes; and whether it would incentivize beneficiaries to engage in their own health care and achieve better health outcomes." Ark. AR 4. These three alternative objectives all point to better health outcomes

as the objective of Medicaid, but that alternative objective lacks textual support. Indeed, the statute makes no mention of that objective.

While furnishing health care coverage and better health outcomes may be connected goals, the text specifically addresses only coverage. 42 U.S.C. § 1396-1. The Supreme Court and this court have consistently reminded agencies that they are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms.*, 512 U.S. at 231 n. 4; *see also Waterkeeper All. v. EPA*, 853 F.3d 527, 535 (D.C. Cir. 2017); *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139–40 (D.C. Cir. 2006). The means that Congress selected to achieve the objectives of Medicaid was to provide health care coverage to populations that otherwise could not afford it.

To an extent, Arkansas and the government characterize the Secretary's approval letter as also identifying transitioning beneficiaries away from governmental benefits through financial independence or commercial coverage as an objective promoted by Arkansas Works. Ark. Br. 14, 37–42; Gov't Br. 24–25, 32. This argument misrepresents the Secretary's letter. The approval letter has a specific section for the Secretary's determination that the project will assist in promoting the objectives of Medicaid. Ark. AR 3–5. The objectives articulated in that section are the health-outcome goals quoted above. That section does not mention transitioning beneficiaries away from benefits. The district court's discussion of the Secretary's objectives confirms our interpretation of this letter. It identifies the Secretary's alternative objective as "improv[ing] health outcomes." *Gresham*, 363 F. Supp. 3d at 179. There is no reference to commercial coverage in the Secretary's approval letter, and

the only reference to beneficiary financial independence is in the section summarizing public comments. In response to concerns about the community engagement requirements creating barriers to coverage, the Secretary stated, "Given that employment is positively correlated with health outcomes, it furthers the purposes of the Medicaid statute to test and evaluate these requirements as a means to improve beneficiaries' health and to promote beneficiary independence." Ark. AR 6. But "[n]owhere in the Secretary's approval letter does he justify his decision based . . . on a belief that the project will help Medicaid-eligible persons to gain sufficient financial resources to be able to purchase private insurance." *Gresham*, 363 F. Supp. 3d at 180–81. We will not accept post hoc rationalizations for the Secretary's decision. *See State Farm*, 463 U.S. at 50.

Nor could the Secretary have rested his decision on the objective of transitioning beneficiaries away from government benefits through either financial independence or commercial coverage. When Congress wants to pursue additional objectives within a social welfare program, it says so in the text. For example, the purpose section of TANF explicitly includes "end[ing] the dependence of needy parents on government benefits by promoting job preparation, work, and marriage" among the objectives of the statute. 42 U.S.C. § 601(a)(2). Also, both TANF and the Supplemental Nutrition Assistance Program (SNAP) condition eligibility for benefits upon completing a certain number of hours of work per week to support the objective of "end[ing] dependence of needy parents on government benefits." 42 U.S.C. §§ 601(a)(2), 607(c) (TANF); 7 U.S.C. § 2015(d)(1) (SNAP). In contrast, Congress has not conditioned the receipt of Medicaid benefits on fulfilling work requirements or taking steps to end receipt of governmental benefits.

The reference to independence in the appropriations provision and the cross reference to TANF cannot support the Secretary's alternative objective either. The reference to "independence" in the appropriations provision is in the context of assisting beneficiaries in achieving functional independence through rehabilitative and other services, not financial independence from government welfare programs. 42 U.S.C. § 1396-1. Medicaid also grants states the "[o]ption" to terminate Medicaid benefits when a beneficiary who receives both Medicaid and TANF fails to comply with TANF's work requirements. *See* 42 U.S.C. § 1396u-1(b)(3)(A). The provision gives states, therefore, the ability to coordinate benefits for recipients receiving both TANF and Medicaid. It does not go so far as to incorporate TANF work requirements and additional objectives into Medicaid.

Further, the history of Congress's amendments to social welfare programs supports the conclusion that Congress did not intend 42 U.S.C. § 1396u-1(b)(3)(A) to incorporate TANF's objectives and work requirements into Medicaid. In 1996, SNAP already included work requirements to maintain eligibility. 7 U.S.C. § 2015(d)(1) (1994). Also in 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act, which replaced Aid to Families with Dependent Children with TANF and added work requirements. Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, sec. 103, § 407, 110 Stat. 2105, 2129–34. At the same time, it added 42 U.S.C. § 1396u-1(b)(3)(A) to Medicaid. *Id.* at sec. 114, § 1931, 110 Stat. at 2177–80. The fact that Congress did not similarly amend Medicaid to add a work requirement for all recipients—at a time when the other two major welfare programs had those requirements and Congress was in the process of amending welfare statutes—demonstrates that

Congress did not intend to incorporate work requirements into Medicaid through § 1396u-1(b)(3)(A).

In short, we agree with the district court that the alternative objectives of better health outcomes and beneficiary independence are not consistent with Medicaid. The text of the statute includes one primary purpose, which is providing health care coverage without any restriction geared to healthy outcomes, financial independence or transition to commercial coverage.

**B. The Approvals Were Arbitrary and Capricious**

With the objective of Medicaid defined, we turn to the Secretary's analysis and approval of Arkansas's demonstration, and we find it wanting. In order to survive arbitrary and capricious review, agencies need to address "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. In this situation, the loss of coverage for beneficiaries is an important aspect of the demonstration approval because coverage is a principal objective of Medicaid and because commenters raised concerns about the loss of coverage. *See, e.g.*, Ark. AR 1269–70, 1277–78, 1285, 1294–95.

A critical issue in this case is the Secretary's failure to account for loss of coverage, which is a matter of importance under the statute. The record shows that the Arkansas Works amendments resulted in significant coverage loss. In Arkansas, more than 18,000 people (about 25% of those subject to the work requirement) lost coverage as a result of the project in just five months. Ark. Dep't of Human Servs., Arkansas Works Program 8 (Dec. 2018), https://humanservices.arkansas.gov/images/uploads/011519_AWReport.pdf. Additionally, commenters on the Arkansas Works amendments detailed the potential for substantial

coverage loss supported by research evidence. Ark. AR 1269–70, 1277–78, 1285, 1294–95, 1297, 1307–08, 1320, 1326, 1337–38, 1341, 1364–65, 1402, 1421. The Secretary's analysis considered only whether the demonstrations would increase healthy outcomes and promote engagement with the beneficiary's health care. *Id.* at 3–5. The Secretary noted that some commenters were concerned that "these requirements would be burdensome on families or create barriers to coverage." *Id.* at 6. But he explained that Arkansas would have "outreach and education on how to comply with the new community engagement requirements" and that Centers for Medicare and Medicaid Services could discontinue the program if data showed that it was no longer in the public interest. *Id.* The Secretary also concluded that the "overall health benefits to the [a]ffected population . . . outweigh the health-risks with respect to those who fail to" comply with the new requirements. *Id.* at 7. While Arkansas did not have its own estimate of potential coverage loss, the estimates and concerns raised in the comments were enough to alert the Secretary that coverage loss was an important aspect of the problem. Failure to consider whether the project will result in coverage loss is arbitrary and capricious.

In total, the Secretary's analysis of the substantial and important problem is to note the concerns of others and dismiss those concerns in a handful of conclusory sentences. Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking. *See, e.g., Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (critiquing an agency for "brush[ing] aside critical facts" and not "adequately analyz[ing]" the consequences of a decision); *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) (analyzing whether an agency actually considered a concern rather than merely stating that it considered the concern).

True, the Secretary's approval letter is not devoid of analysis. It does contain the Secretary's articulation of how he thought the demonstrations would assist in promoting an entirely different set of objectives than the one we hold is the principal objective of Medicaid. In some circumstances it may be enough for the agency to assess at least one of several possible objectives. *See Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999). But in such cases, the statute lists several objectives, some of which might lead to conflicting decisions. *Id.*; *see also Melcher v. FCC*, 134 F.3d 1143, 1154 (D.C. Cir. 1998). For example, in both *Fresno Mobile Radio* and *Melcher*, the statute at issue included five separate objectives for FCC to consider when creating auctions for licenses, including "the development and rapid deployment of new technologies," "promoting economic opportunity and competition," and the "efficient and intensive use of the electromagnetic spectrum." 47 U.S.C. § 309(j)(3). In *Fresno Mobile Radio*, we recognized that these objectives could point to conflicting courses of action, so the agency could give precedence to one or several objectives over others without acting in an arbitrary or capricious manner. *Fresno Mobile Radio*, 165 F.3d at 971; *see also Melcher*, 134 F.3d at 1154; *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101–03 (D.C. Cir. 2009) (explaining that an agency may not "depart from" statutory principles "altogether to achieve some other goal"). The crucial difference in this case is that the Medicaid statute identifies its primary purpose rather than a laundry list. The primary purpose is

> to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation

> and other services to help such families and individuals attain or retain capability for independence or self-care.

42 U.S.C. § 1396-1. Importantly, the Secretary disregarded this statutory purpose in his analysis. While we have held that it is not arbitrary or capricious to prioritize one statutorily identified objective over another, it is an entirely different matter to prioritize non-statutory objectives to the exclusion of the statutory purpose.

## III. CONCLUSION

Because the Secretary's approval of Arkansas Works was arbitrary and capricious, we affirm the district court's judgment vacating the Secretary's approval.